**GULF STATES PAPER CORPORATION v. CARMICHAEL, Atty. Gen. of Alabama, et al. \***

**SOUTHERN COAL & COKE CO. v. SAME.**

Nos. 692, 691.

District Court, M. D. Alabama.

Dec. 15, 1936.

*Motion for modification of injunction granted 57 S. Ct. 614, 81 L. Ed. ——.

226

Borden Burr, of Birmingham, Ala., Neil P. Sterne, of Anniston, Ala., and Marion Rushton, of Montgomery, Ala., for plaintiff in No. 691.

Forney Johnston, Joseph F. Johnston and Lucien D. Gardner, Jr., all of Birmingham, Ala., for plaintiff in No. 692.

A. A. Carmichael, Atty. Gen., of Alabama, and Inge & Stallworth, of Mobile, Ala., for defendants.

Before SIBLEY, Circuit Judge, and KENNAMER and ERVIN, District Judges.

## PER CURIAM.

### Statement.

The Federal Social Security Act was approved August 14, 1935 (42 U.S.C.A. §§ 301–1305). The Alabama Unemployment Compensation Law was approved September 14, 1935 (Gen.Acts 1935, p. 950) and amended by three acts approved April 21, 1936 (Gen.Acts 1936, Ex.Sess. pp. 176, 225, 228). The Alabama act follows the suggestions or requirements of the Social Security Act and has been approved by the Federal Social Security Board. The Alabama act creates the Alabama Unemployment Compensation Commission to administer it, and its enforcement in court is required of the Attorney General of Alabama. Under the Alabama act reports by employers have been required and payments, being pay roll percentages in part deducted from employees' pay and in part paid by the employers, are already due and demanded. Failures to comply are punishable by cumulative penalties and by criminal prosecutions, all requiring court action. Two bills have been filed in this court seeking preliminary and permanent injunctions and other relief, against the members of the Alabama Unemployment Compensation Commission and the Attorney General of Alabama, one by the Southern Coal & Coke Company and one by the Gulf States Paper Company, and have been heard together by a court of three judges on the same evidence, and on their respective pleadings. The Alabama act is assailed as unconstitutional both under the equal protection and due process clauses of the Fourteenth Amendment, and under the Alabama Constitution, and the Social Security Act which is contended to be necessarily involved in the Alabama act is assailed as being not within the powers of Congress and in violation of the due process clause of the Fifth Amendment. Other constitutional difficulties are alleged. Both preliminary and permanent injunctions are now for decision.

### Findings of Fact.

1. There is in each case diversity of citizenship and more than $3,000 involved exclusive of interest and costs.

2. If payment be made of the sums demanded, their recovery, if the act be unconstitutional, would be uncertain and difficult, no clear and adequate remedy at law being apparent, and there would arise a multiplicity of suits with employees whose pay was withheld. If payment be refused so as to test the validity of the act by a forced collection, penalties and criminal liabilities would be incurred if the act be valid, both numerous and serious, so that the remedy by resistance at law is not safe and adequate. The remedy here sought in equity is more certain and effectual.

3. The act seeks to alleviate the public evils and private hardships of unemployment. The evidence, aided by common knowledge, shows that Alabama was originally and still is predominantly an agricultural state, and that in agriculture unemployment is not an acute problem. The land may always be tilled and will yield a living, though business conditions be adverse, and even the old and the ill are generally worth their keep on a farm. The development of capitalistic industry has created a great class who work for others and have no capital but only their capacity to work. On the average, they save nothing and make no adequate provision for illness, old age, or unemployment. Illness and old age, though fairly certain to come, are spread out in time and space. Unemployment becomes acute and cumulative in periods of business depression, the unemployed, especially in industrial communities, are unable to help each other, or to help themselves, and suffer great dis-

tress, even starvation. Sickness is apt to occur, criminality is encouraged, and riot and revolution risked. The whole public is vitally interested in ameliorating the distress of such unemployment.

4. In the past no special legislative remedy for unemployment has been attempted. Poverty, however caused or by whomever suffered, has had the traditional relief in Alabama by poor laws, through the counties and their general taxation. This relief is limited and proved wholly inadequate during the great depression of the past few years.

5. The remedy proposed in the act of September 14, 1935, is, as interpreted in behalf of the state of Alabama in the answers, not a relief for indigence, but a scheme for compulsory insurance against unemployment, in which the beneficiary draws his benefits, not because he is poor, but because he has paid for them. The relief is not complete, for there is a waiting period during which nothing can be drawn, and the relief when it begins continues in general for only sixteen weeks, and covers but half the wage loss in those weeks. But it gives a support for a time within which new employment may be found or the old resumed, and keeps some money in circulation to uphold general business, relieving the cumulative collapse that so often attends either local or general business depressions. The means adopted by the Legislature is appropriate to the end in view.

6. At the passage of the act there were no accurate and full data available on which actuarial estimates could be made of the fund and the contributions necessary to sustain the proposed benefits. Unemployment, as it depends on business cycles, would seem hardly predictable. But the Legislature had the federal census of 1930, the investigations and tabulations of the Federal Bureau of Labor Statistics, and the data and suggestions assembled in connection with the Federal Social Security Act, besides the fund of general knowledge and the judgment which all legislatures are supposed to possess. There were no special hearings touching the proposed law, but it had the usual constitutional delays in its passage. It was reconsidered for amendment in April, 1936. The act is on its face somewhat tentative, in that the right to amend and repeal is expressly reserved, a delay of two years provided before benefits can be paid, and the Commission established is to get information and acquire experience which is to be made the basis of classifications and adjustment of rates after 1940.

7. The exceptions from the act have discernible reasons which prevent them from being arbitrary. The peculiar status of agriculture and its slight need for the remedy have been above alluded to. Domestic service in homes is similar, such servants seldom being discharged in great numbers at once or left to suffer. The same is true of the employers of the near relatives mentioned in the act. Service on ships in navigable waters, service on interstate railway carriers, and for the United States and its instrumentalities are peculiarly subject to federal law, and impositions on employer and employee would run into peculiar difficulties. So also impositions on charitable institutions and their employees would burden the charities which are semipublic at best. The state and its instrumentalities are excluded for like reasons. Why solicitors and agents of insurance companies are omitted is not apparent.

8. The main classification is between employers of eight persons or more and those of less than eight. Some employers and employees are now by litigations opposing the law on the ground that it is arbitrary to include in the burdens and benefits of the law employers and their employees where there are eight employed and to exclude where there are only seven or six. No reason for the difference thus made appears. It is suggested that very small pay rolls would not yield much contribution nor pay to bother with. But from the employee standpoint the need of protection is not less because he works with fewer employees, and from the public standpoint the unemployment of a number of persons carries the same menace whether they formerly worked for large or small concerns. It is evident that six or seven high-salaried employees would cause a much greater pay roll than a dozen or fifty day-laborers. No reason is found for the inclusion alone of employers of eight or more persons; nor why less than all should be included. If a store having seven employees is competing with one having eight, it is manifest that the former can undersell the latter, and the latter must discharge one employee, or go broke and discharge all eight, equalizing wage reductions being forbidden.

9. The evidence shows that petitioners here, and many other employers of hundreds of workers each, have a record of few or no discharges except for cause for a number of years past even during the recent depression, and have no prospect of unemployment in the future; so that if the act had been in force in the past they would have paid in many thousands of dollars each year, but their employees would have gotten almost nothing, and that the same thing will likely be true in the future. On the other hand, many employments are habitually seasonal and fluctuating, unemployment being large and regularly recurrent, so that benefits in excess of contributions will be drawn and at the expense of employers and employees of the more stable employments. The pooling of funds for all employments under the act will thus result almost certainly in making certain classes of business carry the burden of benefits to other classes. The general and indirect benefit to all business resulting from the disbursement of the benefits is not a practical offset to this inequality. It is, however, also true that in a period of years every employer may meet disaster and have to curtail or cease operations, so that there is always the possibility of his employees drawing benefits above those indicated by his previous record.

10. Contributions required of employees are but premiums for an insurance protection. Contributions required of employers can hardly be called such. Employers have no direct benefit from the insurance fund. Such contentment as it may give employees, or such general improvement to business as its disbursement may cause, are too indirect and vague to be measured. The direct effect of the law is to require the employer to pay about two-thirds of the premium necessary to protect the employee. It is equal to a compulsory increase by that much of the wages paid to be devoted to insurance for the employee's benefit. In the long run it might be absorbed in a general reduction of wages by force of business competition, next adverted to.

11. The business of both petitioners is interstate and in competition with others. In the coal mining business of one petitioner there is a great labor handicap in that because of geological conditions in Alabama a miner there cannot produce as much coal as in a mine say in Indiana. The burden of the act might force the employer to reduce labor costs or go out of business. Nearly all business in the United States proceeds in competition with business in other states. Any special or other legislation burdensome to business which may be adopted in one state will put the business of that state at a disadvantage in the competition. The state cannot protect itself by a tariff or otherwise curb the competitors in the other states by reason of the Federal Constitution. Hence the necessity of co-ordination through the federal government, sought to be had in this instance by the Social Security Act.

12. The provisions of the Social Security Act did not intimidate the members of the Alabama Legislature into passing the Alabama act, but did induce its passage by making it appear more advantageous to the state than not to pass it. The Legislature provided that if the federal act should be held unconstitutional by the Supreme Court of the United States, the Alabama act shall become inoperative. The state of Alabama does not here complain that her freedom of legislation has been interfered with.

## Conclusions of Law.

1. The court has jurisdiction, both federal and equitable.

2. The evils of unemployment are such as to be taken cognizance of under the police powers of the states and to authorize a remedy which is not forbidden by the Constitutions.

3. Compulsory insurance against unemployment, though a new remedy in the United States of America, is a possible one. Recognizing the troubles that have come from allowing the capitalist to hire the worker, it could be considered as a regulation, operating in futuro, conditioning the right to engage in such hiring. But the right to work for a wage, or to hire another, is among the fundamental liberties of the country, and they cannot be arbitrarily narrowed or taken away. See Adkins v. Children's Hospital, 261 U.S. 525, 43 S.Ct. 394, 67 L.Ed. 785, 24 A.L.R. 1238. Whether the requirement of this insurance and the payments to support it be arbitrary or not depends on the state of society at the time and the urgency of the need for the regulation. Of such things the Legislature is the primary judge. Several businesses, such as motor carriage, have been required to carry in-

surance. Marriage in Alabama could formerly be contracted only on giving a bond. We are not required in this case to give an opinion on this broad question of police power, because this legislation must fall on a narrower point.

■ 4. If an insurance act like this could stand up which either covered all employments (not excepted for valid reasons), or which classified employments so closely as to escape arbitrary imposition of burdens (see Mountain Timber Co. v. Washington, 243 U.S. 219, 37 S.Ct. 260, 61 L.Ed. 685, Ann.Cas.1917D, 642), the present act denies due process in that the classification of employers having eight or more employees is entirely arbitrary. Whether viewed from the standpoint of employers or employees, there is no reason for the distinction made, and equal protection of the law is not afforded either to employers or employees. Colgate v. Harvey, 296 U.S. 404, 423, 425, 56 S.Ct. 252, 80 L.Ed. 299, 102 A.L.R. 54.

■ 5. The requirement that employers pay about two-thirds of the contribution to the general fund for the direct benefit of the unemployed with no direct benefit to themselves violates the provisions of article 1, § 23, of the Alabama Constitution. Robertson v. Collins, 218 Ala. 54, 117 So. 415.

■ 6. The Social Security Act, supposing it to be valid, did not operate either to coerce or bribe the Alabama Legislature or to impair the validity of their legislative action. The motives of legislators cannot at the instance of private litigants be enquired into by courts. Fletcher v. Peck, 6 Cranch, 87, 130, 131, 3 L. Ed. 162; United States v. Des Moines Nav. & R. Co., 142 U.S. 510, 545, 12 S. Ct. 308, 35 L.Ed. 1099; Angle v. Chicago, St. P. M. & O. R. Co., 151 U.S. 1, 17, 14 S.Ct. 240, 38 L.Ed. 55; Cooley Const. Lims. (8th Ed.) pp. 379, 380.

■ 7. The Alabama act being disposed of because the court finds it to be violative of the Constitution of the United States and that of Alabama, it is unnecessary for this court to pass on the constitutionality of the federal act. Tennessee Publishing Company, Petitioner, v. American National Bank, 299 U.S. 18, 57 S.Ct. 85, 81 L.Ed. ——, decided by the Supreme Court of the United States November 9, 1936. We make no decision and express no opinion as to the constitutionality of the federal act.

■ 8. Chamberlin, Inc., v. Andrews, 271 N.Y. 1, 2 N.E.(2d) 22, affirmed by an equal division of the Supreme Court of the United States, 57 S.Ct. 122, 81 L.Ed. ——, is of no authority on the federal questions involved. Hertz v. Woodman, 218 U.S. 205, 30 S.Ct. 621, 54 L.Ed. 1001.

Decrees for injunction were entered accordingly.